IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

TIMOTHY GUILFOY,                    )
                                    )
        Petitioner,       )
                                    )
v.                                  )    NO. 3:18-cv-01371
                                    )
MICHAEL PARRIS, Warden,             )    JUDGE RICHARDSON
                                    )
        Respondent.       )


**<u>MEMORANDUM OPINION</u>**

       Petitioner Timothy Guilfoy filed a Petition for Writ of Habeas Corpus under 28 U.S.C.

§ 2254 in the Western District of Tennessee (Doc. No. 1), challenging the legality of his 2011

conviction in Davidson County Criminal Court. (*Id.* at 1.) The Western District stayed and

administratively closed the matter while Petitioner made a final attempt to win relief in state court.

(Doc. No. 11.) After that attempt proved unsuccessful, the Western District lifted the stay,

reopened proceedings in this federal habeas case, and transferred the matter to this Court because

Petitioner's conviction was obtained in a state court that lies within the Middle District of

Tennessee. (Doc. No. 13.)

       Petitioner subsequently filed an Amended Petition (Doc. No. 31), and Respondent filed the

state-court record (Doc. Nos. 37, 38) and an Answer to the Amended Petition. (Doc. No. 39.)

Petitioner filed a Reply to Respondent's Answer (Doc. No. 52), followed by a supplement to that

Reply. (Doc. No. 55.)

       This matter is ripe for the Court's review. Respondent does not dispute that the Petition in

this case is timely, that this is Petitioner's first Section 2254 petition related to this judgment of

conviction, or that he has no available state remedies left to pursue. (Doc. No. 39 at 1–2.) Having

reviewed Petitioner's arguments and the underlying record, the Court finds that an evidentiary hearing is not required. As explained below, Petitioner is not entitled to relief under Section 2254, and his Petition will therefore be denied.

## I. PROCEDURAL HISTORY

Petitioner was indicted in 2011 on four counts of aggravated sexual battery against a minor victim, referred to by the initials "J.A." to protect her privacy; one count of aggravated sexual battery against J.A.'s minor sister, T.A.; and three counts of rape of a child against T.A. (Doc. No. 37-1 at 41–48.) These charges came to trial in July 2011, resulting in a hung jury and declaration of mistrial. (Doc. No. 37-4 at 18.)

Petitioner was retried and convicted on all counts except the aggravated sexual battery of T.A, on which charge the State entered a nolle prosequi. (Doc. No. 37-4 at 26.) One of the four counts of aggravated sexual battery against J.A. resulted in conviction on the lesser-included offense of assault, and one of the child rape charges against T.A. resulted in conviction on the lesser-included offense of aggravated sexual battery. (Doc. No. 37-8 at 147–48.) Petitioner received a total effective sentence of 70 years' incarceration. (Doc. No. 37-4 at 33.) He filed a motion for new trial, which was heard and denied by the trial court. (*Id.* at 85.)

On direct appeal, the Tennessee Court of Criminal Appeals (TCCA) affirmed Petitioner's convictions on one count of aggravated sexual battery against both J.A. and T.A. It then merged[1] two aggravated sexual battery convictions against J.A. (counts 1 and 2 of the indictment) into a single conviction, the two child rape convictions against T.A. (counts 6 and 7 of the indictment)

---

[1] Merger is used to prevent or cure a double jeopardy violation that would result from a single wrongful act being elected by the State as the basis for more than one charge of conviction. *See State v. Elmore*, No. W2011-01109-CCA-R3CD, 2012 WL 6475554, at *14 (Tenn. Crim. App. Dec. 13, 2012) (remanding for merger because "both of the defendant's convictions arise from a single transaction—the defendant's assault on the victim on the morning of March 2, 2009," and he "was convicted for this assault twice . . . using two different theories of criminal liability").

into a single conviction, and the conviction for assault against J.A. (lesser included offense of count 4 of the indictment) into the remaining conviction for aggravated sexual battery against J.A. (count 3 of the indictment). The upshot of these mergers is that Petitioner was convicted of two counts of aggravated sexual battery of J.A., one count of aggravated sexual battery of T.A. (as a lesser included offense of child rape), and one count of child rape of T.A. (*See* Doc. No. 37-22 at 75.) The TCCA remanded the matter for resentencing in light of the mergers. *State v. Guilfoy*, No. M2012-00600-CCA-R3-CD, 2013 WL 1965996 (Tenn. Crim. App. May 13, 2013). Petitioner's application for permission to appeal to the Tennessee Supreme Court was denied. (Doc. No. 37-21.) On resentencing, the trial court imposed an effective sentence of 40 years. (Doc. No. 37-22 at 75.)

Petitioner filed a timely petition for post-conviction relief, which was supplemented twice by counsel. (Doc. No. 37-22 at 62–74, 76–83.) After holding an evidentiary hearing, (Doc. No. 37-23), the court denied post-conviction relief. (Doc. No. 37-22 at 84–88.) The TCCA affirmed, *Guilfoy v. State*, No. M2014-01619-CCA-R3-PC, 2015 WL 4880182 (Tenn. Crim. App. Aug. 14, 2015), and denied rehearing. (Doc. Nos. 37-35, 37-36.) The Tennessee Supreme Court denied permission to appeal. (Doc. No. 37-39.)

Petitioner filed a state-court petition for writ of error coram nobis on January 17, 2017 (Doc. No. 37-40 at 48–68) and, two weeks later, filed his original habeas petition in federal court. (Doc. No. 1.) On August 15, 2017, federal proceedings were stayed pending the outcome of coram nobis review. After coram nobis relief was denied in the state trial and appellate courts, *see Guilfoy v. State*, M2017-01454-CCA-R3-ECN, 2018 WL 3459735 (Crim. App. Tenn. July 17, 2018), Petitioner returned to federal court to resume his pursuit of relief under Section 2254. The Western

District reopened these proceedings and transferred the case to this District on December 13, 2018. (Doc. No. 13.)

## II. REVIEW OF THE RECORD

A. <u>Proceedings at Trial and on Direct Appeal</u>

The TCCA summarized the facts of this case in its opinion on direct appeal. The parties do not dispute the following statement of facts in evidence at Petitioner's trial, as provided by the TCCA:

At the Defendant's second jury trial, the following proof was adduced:

Jennifer A., the victims' mother ("Mother"), testified that, when she and her three daughters moved to Nashville from Indiana in 2005, they began living at the Biltmore Apartments. Her father, Brian Schiff ("Grandfather"), was living there at the time, and they moved in with him. It was a two-bedroom apartment, and she described the living conditions as "pretty crunched." After several months, Grandfather purchased a nearby house on Saturn Drive, and they all moved into the house. Mother stated that, when they moved into the house on Saturn Drive, it had an unfinished basement and an unfinished attic. She used the attic as her bedroom except in the summertime. The girls slept on the main floor but did not have their own separate bedroom. The girls' sleeping accommodations included a bunk bed, a futon, and a couch that pulled out to a bed. Usually, J.A. slept in the top bunk of the bunk bed.

While they were still living in the apartment, Mother became acquainted with the Defendant. He and his roommate lived next door to them. The Defendant came to visit Mother and her family in Mother's apartment. Mother and her family also visited the Defendant in his apartment. Mother described their relationship as "friends" and denied that there was ever any romantic interest on either her or the Defendant's part. She added that the Defendant was a "really good friend."

Not long after Mother and her family moved to the house on Saturn Drive, the Defendant moved out of his apartment to another location in Nashville. The Defendant visited them at their house on Saturn Drive. A few months later, the Defendant moved to Missouri. The Defendant continued to stay in touch through phone calls and visits.

Mother explained that the Defendant worked in marketing tours and would come to Nashville to participate in events such as the "CMA festival." He usually would drive to town in a tour vehicle, and he would stay with Mother and her family at the Saturn Drive house. In this way, he was able to keep the per diem he was paid

for hotels. Mother stated that she and her daughters enjoyed having the Defendant stay with them.

Mother stated that it was not her intention that the Defendant spend the night sleeping in any of the girls' beds, but she knew that he did because she would find him in one of their beds in the morning. She remembered one particular occasion when she saw the Defendant in bed with J.A. in the top bunk of the bunk bed. At that time, the bunk bed was in the dining room. She also recalled finding the Defendant in bed with T.A. on "[m]ultiple" occasions. She did not say anything to the Defendant about his presence in bed with her children.

In May of 2008, Mother, the girls, and the Defendant planned a camping trip to celebrate J.A. and Mother's birthdays, which were close together in time. Mother stated that they camped two nights, and everyone had a good time.

Mother decided that she wanted to leave Nashville and move to Clarksville. The Defendant had expressed an interest in real estate investment, specifically, purchasing a house and renting it out. When Mother told him she was interested in moving to Clarksville, he purchased a house there, and she rented it from him. She stated that the rent was $700 a month. She also testified that the Defendant told her that she "wouldn't ever have to worry about just being kicked out of the house." Mother testified that the Defendant realized that she "might not always be able to come up with seven hundred dollars." She also stated that the Defendant was welcome to spend the night there. She added that it "was supposed to be a permanent move."

One morning in Clarksville, after the girls had gotten on the bus to go to school, Mother spoke with Grandfather over the phone. Grandfather told her that J.A. had told him "what happened." After her conversation with Grandfather about what J.A. had told him, Mother retrieved her daughters from school. Mother subsequently spoke with J.A. and T.A. and then she called 911. Two deputies from the Montgomery County Sheriff's Department responded and she relayed to them what J.A. and T.A. had told her. Mother testified that she called the police regarding the instant allegations on or about March 15th, 2009. The Defendant had been there three days previously.

In conjunction with the ensuing investigation, Mother made several recorded phone calls to the Defendant. She made these calls in March 2009. Mother and her family remained in the Defendant's house for about one more month. The Defendant did not serve her with an eviction notice.

On cross-examination, Mother admitted that she and the Defendant had a formal lease agreement regarding the house. She did not mail rent payments to the Defendant but deposited them twice a month into a bank account the Defendant had established. She also admitted that, whenever the Defendant came to visit, her daughters "rushed to the door and hugged him." She did not see either J.A. or T.A.

acting frightened around the Defendant. She acknowledged that, when J.A. was six and seven years old, she was wetting the bed and wore pull-ups.

Mother testified that, when the Defendant was staying with them, she usually fell asleep before he did. She did not tell him where to sleep. While they were living on Saturn Drive, the girls would fight over who got to sleep with the Defendant. She did not intervene in these discussions.

Mother acknowledged that she and her daughters moved to Clarksville in September 2008. She already had been attending a junior college in Clarksville during the summer months. She was not able to pay September's rent, so the Defendant told her that she could pay it later by increasing the rent due in subsequent months. In October, she dropped out of school. She paid part of her rent for the months of October and November. She got a job in December and was able to pay December and January rent. She was fired in February. She earlier had told the Defendant that she would file her federal income tax return early in order to get her refund and pay him some of the money she owed him. She, however, did not get a refund. Mother remained in the house through at least a portion of May.

Mother admitted that, in early March 2009, the Defendant told her that he was having a hard time making the mortgage payments on the house. She denied that he told her that, if she could not pay the rent, he would have to get a tenant who could.

J.A., born on May 22, 2000, and eleven years old at the time of trial, testified that she had two older sisters, T.A. and A.A. She began living in Nashville "quite a few years ago" in an apartment. She lived with her sisters, Mother, and Grandfather. The Defendant, whom J.A. identified at trial, lived in the apartment next door.

J.A. and her family later moved into a nearby house. The house had a basement, attic, and main floor. Sometimes, Mother used the attic as her bedroom. Grandfather used the basement as his living area. Sometimes the girls used the dining room as their bedroom. They used a regular bed and a bunk bed. J.A. usually slept in the upper bunk bed.

Sometimes the Defendant would spend the night at the house. On some of these occasions, the Defendant would sleep in J.A.'s bunk bed with her. J.A. testified that, on one of these occasions, the Defendant touched her "private" with his hand. She stated that he touched her skin by putting his hand down the front of her pants. She also stated that his hand moved and that she got up and went to the bathroom. She then went to sleep with one of her sisters. J.A. testified that the Defendant touched her in this manner on more than one occasion. J.A. stated that, when the Defendant touched her while in bed with her, she was not sure if the Defendant was awake at the time the touchings occurred.

J.A. also testified that, at another time, she was sitting on the Defendant's lap on the couch. The Defendant put his hand down the back of her pants and then slid his hand under her legs. He touched her "private" on her skin. When shown a drawing of a girl's body, J.A. identified the genital region as the area she referred to as her "private."

J.A. went camping with her family and the Defendant for J.A.'s eighth birthday. This trip occurred after the touchings about which J.A. testified. The Defendant did not touch her inappropriately on this trip.

After a while, J.A. decided to tell Grandfather what had happened. This was some time after she and her family left the house on Saturn Drive and moved into a house in Clarksville that the Defendant owned. Grandfather remained in the house on Saturn Drive. When she told Grandfather what the Defendant had done, he told her to tell Mother. She did not do so, however, because she did not think Mother would believe her. Some time later, Grandfather told Mother what J.A. had told him but did not identify the Defendant. J.A. then told Mother what had happened. According to J.A., Mother then told her boyfriend. J.A. and T.A. went to school, but Mother came and got them out of school a little later. She took them home and "called the cops." J.A. subsequently was interviewed by a woman named Anne. The interview was videotaped. J.A. also visited a doctor, who examined her. She did not remember what she told the doctor but testified that she would have told the truth.

On cross-examination, J.A. stated that the touching on the couch occurred while she was in second grade. At the time, her sisters were in the room with her. Also home at the time were Grandfather, her grandmother, Mother, and Mother's boyfriend, "Bob-o." J.A. acknowledged that the Defendant's visits were sometimes short, and he did not spend the night. She and her sisters were glad to see the Defendant during his visits. She did not remember the Defendant taking her anywhere by herself. He never said anything to her that made her uncomfortable.

J.A. admitted that, at the time the touchings occurred, she wore a "pull-up" because she had a problem with bed-wetting. She stated that she did not know if she was wearing a pull-up when the Defendant touched her on the occasions she testified about. She also stated that the Defendant had been lying behind her and she was facing away from him. She did not know if he was awake or asleep when the touching occurred. She stated that she had watched the videotape of her interview [with Anne] twice.

On redirect examination, J.A. stated that the only thing about the Defendant she did not like was the touchings. She never got mad at him or fought with him. She never saw her sisters or Mother be mad at him. When asked how many times the Defendant touched her inappropriately, she responded, "Maybe three or four times."

T.A., born on February 26, 1999, and twelve years old at the time of trial, testified that she currently lived in Florida with her two sisters, her brother, her father, and her stepmother. She previously had lived in Nashville with her two sisters, Mother, and Grandfather. She was the middle of three daughters.

T.A. identified the Defendant and stated that he lived next door to them while they lived in an apartment in Nashville. T.A. and her family later moved to a house on Saturn Drive. She stated that, while the family lived there, they frequently changed the furniture arrangements because the house was small. At one point, the family room was set up with a bunk bed and a futon. Another time, the bunk bed and a queen-size bed were in the dining room. Usually, T.A. and J.A. slept in the bunk bed, with T.A. on the bottom bunk. T.A.'s older sister, A.A., usually slept in the queen-size bed. Sometimes, T.A. would sleep on the futon in the family room to "get away from [her] sisters."

T.A. testified that the Defendant spent the night at the house on Saturn Drive "maybe three times." On these occasions, the Defendant slept in the family room or the dining room. On one particular occasion, the Defendant slept in T.A.'s bed. She testified: "I was about to go to bed. It was either on the futon or the bunk bed. I'm not too sure. He had climbed in the bed, and I was already laying down. And he rolled me over and put his hand down my pants." The Defendant touched her "private part" with his finger, on her skin. She added that the Defendant's finger "went inside [her] private part." She left her bed and got in bed with her big sister. She added that she was "not too sure" if the Defendant was awake when this occurred.

T.A. testified that, on another occasion, she was laying on her bunk bed when the Defendant came in and started touching her. She tried to get up, but he held her down. He touched her private part with his finger again, and she "just started crying." She got up, telling him that she had to go to the bathroom. She left and stayed away. T.A. stated that the Defendant had touched her on "[t]he inside." She also stated that this episode caused her to "want to puke."

T.A. testified that, in response to the Defendant's actions, she started wearing khaki pants to bed because they did not have an elastic waistband. She stated that the Defendant touched her another time while she was wearing her khaki pants and that he unzipped and unbuttoned them. This happened on her bunk bed. She testified, "[h]e touched me with his finger on [her] private part on [her] skin on the inside."

T.A. testified that the Defendant touched her more than three times. The touchings were similar to one another. When asked to indicate on a drawing the parts of the body that the Defendant touched, T.A. indicated the female genitalia. When asked what she meant by "inside," she indicated, as reported by the prosecutor for the record, "[in between . . . ] the outer labia of the female genitalia."

T.A. stated that the touchings occurred before the family camping trip that they took for J.A.'s eighth birthday. She stated that she never told anyone about the touchings. She recalled J.A. telling Grandfather, however, and she remembered when Mother spoke with them while they were waiting for the school bus. T.A. testified that J.A. told Mother what had happened and that Mother began to cry. Both the girls began to cry, too. Nevertheless, the girls got on the bus and went to school.

Mother picked them up from school early that day, and they went to the District Attorney's office. There, T.A. spoke with Anne Fisher. T.A. since had watched the videotape of her interview with Fisher. After the interview, T.A. was examined by a doctor.

T.A. testified that she liked the Defendant other than his touching her. She testified that her mother and the Defendant were good friends.

On cross-examination, T.A. acknowledged that, in July 2011 [(at Defendant's first trial)], she testified that the Defendant had not touched her in the same place that a tampon would go. Rather, she had earlier testified that he touched her "[l]ike on top of it," "[l]ike not literally on the outside, but like on the outside of it, yes, but like inside," and "[b]ut on the top, like where something else—like I don't know. Yeah. It wasn't like literally inside, inside, but it practically was. Yes." On cross-examination at trial, she testified that the Defendant touched her inside, where a tampon goes.

T.A. admitted that the Defendant never had threatened her, never had told her that they had a secret, and never had promised her anything for her silence. He did not speak with her about sex or boyfriends, and he never said anything that made her uncomfortable. He never pressed his body against hers, never made her touch his "private part," and never showed his "private part" to her.

On redirect examination, T.A. explained that the Defendant had visited them in the house on Saturn Drive more than four times, but that he would not stay more than three days per visit.

Chris Gilmore testified that he was a school resource officer with the Cheatham County Sheriff's Department but previously had been employed as a police officer with the Clarksville Police Department. On March 18, 2009, he responded to Mother's address on an allegation of child rape. From Mother, he gathered basic information. He did not speak to any children. He notified the appropriate persons within the police department for follow-up.

Detective Ginger Fleischer of the Clarksville City Police Department testified that she was assigned to investigate the matter reported by Mother. Because the alleged criminal conduct had taken place in Nashville, she contacted the appropriate Nashville authorities. Detective Fleischer and Detective Fleming of the Davidson

County Police Department determined that a "controlled phone call" between Mother and the Defendant would be helpful to the investigation. She explained to Mother that the phone call would be monitored and recorded. The phone call was scheduled to take place on March 24, 2009, the day after the forensic interview of the children. On that day, Mother made three phone calls to the Defendant, and all three phone calls were recorded and transcribed. The recordings were admitted into evidence and played for the jury. A fourth recorded phone call was made by Mother to the Defendant on the next day. This recording also was admitted into evidence and played for the jury. Additionally, the transcripts of all the recorded phone calls were admitted.

Hollye Gallion, a pediatric nurse practitioner with the Our Kids Center in Nashville, testified that she performed medical examinations on J.A. and T.A. on April 21, 2009. In conjunction with performing the exams, she reviewed the medical history reports given by the children to a social worker. J.A. reported that "a guy named Tim" had touched the outside of her butt and the outside of her "tootie" with his hands, explaining that she "pee[d]" out of her "tootie." J.A. reported that the touching had occurred more than once. Asked if she remembered the first time, J.A. reported, "It was in our old house in Nashville; I was around six or seven years old."

Gallion testified that J.A.'s physical examination was "normal." She did not find "any injuries or concerns of infection." She also stated that the results of the physical examination were consistent with the medical history that J.A. reported. Gallion added, "Touching typically doesn't leave any sort of evidence or injury."

Gallion testified that, in giving her medical history to the social worker, T.A. reported that the Defendant had touched the outside of her "too-too" with his hand, explaining that she "pee[d]" from her "too-too." T.A. reported that the touching had occurred more than once and that she was "around five or six" the first time. On conducting a physical exam, Gallion concluded that T.A.'s genital area and her "bottom" "looked completely healthy and normal." Gallion added that T.A.'s "physical exam was very consistent with what her history was."

Anne Fisher Post, a forensic interviewer employed by the Montgomery County Child Advocacy Center, testified that she conducted forensic interviews of J.A. and T.A. These interviews were recorded and, without any contemporaneous objection from the Defendant, the recordings were admitted into evidence but were not played for the jury.

*Guilfoy v. State*, 2013 WL 1965996, at *2–8.

Ms. Post's testimony included the following exchange pertinent to the issues raised in the

Amended Petition:

Q:      (By Assistant District Attorney General Sharon Reddick:)   Now, I want to just ask you a little bit about what you can expect from a forensic interview.

You have testified that you hope -- they're designed to give the best and most accurate information possible.

What is your experience in the area of interviewing children who have perhaps been subjected to a number of instances of abuse over a fairly lengthy period of time, beginning when they are very young?

Is it realistic to expect that you'll get every detail from every incident?

A:      Certainly not. It depends, too, on the age of the child. Very little children, we expect to capture only very limited information about any event that happens in their lives. And there are lots of things that can disrupt a kid's memory of an abuse event. Trauma can disrupt memory, for example.

And events that are very similar can be very hard to separate. I think we all know that [from] our own experience. If you have the same event over and over in your own life, it can be very difficult to provide a narrative detailed account of one specific incident of that same event.

Q:      They all blend together?

A:      Yes.

Q:      I want to show you what's previously been marked for identification as Exhibit No. 3.

Actually, I'll take it first because I want to ask you some more questions.

Ms. Post, did you interview two children in the Advocacy Center in the spring of 2009 named [J.A.] and [T.A.]?

A:      I did.

Q:      I want to hand you this item that's previously been marked for identification as No. 3, and ask if that appears to be the disk of the interview that I asked you to review?

(Item provided to the witness.)

A:      It appears to be.

Q:      Subject to some redactions, does that accurately reflect the content of your interview with [J.A.]?

A:      It does.

MS. REDDICK:      If that can be marked an exhibit to her testimony.

THE COURT:      That was No. 3 that was previously marked for identification only.

MS. REDDICK:      Thank you, Judge. Yes.

                Now, if I can be handed No. 6?

        (Item provided to the witness.)

Q:      (By Ms. Reddick:) Did I also ask you to review your interview with [T.A.]?

A:      You did.

Q:      Again, subject to some – what does that appear to be?

A:      It appears to be that interview that I reviewed.

Q:      And subject to some redactions, does that appear to accurately reflect the content of your conversation with [T.A.]?

A:      It does.

MS. REDDICK:      Your Honor, I'd ask to make that an exhibit to her testimony. Those are my questions.

THE COURT:      All right. Which was also previously identified and admitted for identification purposes only. Now it is an exhibit.

(Doc. No. 37-8 at 68–71.)

        Defense counsel did not object to the admission of these exhibits or cross-examine Ms.

Post, and the State rested its case after she testified. The State then delivered an election of

offenses[2] to the jury in which it specified the dates and particular misconduct by Petitioner that

---

[2] The election of offenses doctrine "refers to the prosecutor's duty in a case where evidence of multiple separate incidents is introduced to elect for each count charged the specific incident on which the jury should deliberate to determine the defendant's guilt." *State v. Qualls*, 482 S.W.3d 1, 9 (Tenn. 2016). It "serves to ensure that the jury understands its obligation to agree unanimously that the defendant committed

corresponded to counts one, two, three, four, six, seven, and eight of the indictment, and withdrew count five of the indictment from the jury's consideration. (*Id.* at 71–75.)

The defense recalled Detective Fleisher to inquire into her level of involvement with the controlled calls Mother made to Petitioner in March 2009, and then called Petitioner's mother (Francene Guilfoy), brother (Tony Guilfoy), father (Patrick Guilfoy), and close friend (Matt Jaboor). The defense then rested. (*Id.* at 79–144.)

During closing argument, after noting that the jury had "heard the evidence, the testimony," the prosecutor remarked to the jury as follows:

> And yes, there are exhibits, things that you can take back into the jury room with you. Actually, everything that we have introduced can be taken back, looked through, so that's why I'm not going to put everything up and say, oh, look, remember this, we saw this.
>
> One thing I do want to mention is, remember the forensic interviews, those tapes, that we did not play those. For one thing, we're lucky to get these to work to play the ones that we did.[3] But those are video. And we don't have the capability out here.
>
> In the back, in the jury room, should you – obviously, it's your decision whether you want to watch them or not, but should you decide to, we have the capability, or the Court does, to get a TV and all that to play those, those forensic interviews, the girls by themselves, with the interviewer in March, April, 2009, when that occurred.
>
> I just mention that sort of as, well, if you wonder why didn't we watch those or hear those, that's the reason.

(Doc. No. 37-9 at 3–4.)

---

the same criminal act before it may convict the defendant of a criminal offense." *Id.* at 10. The doctrine also, among other things, "assists the defendant in preparing for and defending against the specific charge [and] protects the defendant from double-jeopardy concerns." *Id.*

[3] In its opinion on direct appeal, the TCCA quoted this portion of the State's closing argument and inserted at this point the following, clarifying footnote: "The State had earlier experienced technical difficulties in playing the recordings of the phone calls between the Defendant and Mother." *State v. Guilfoy*, 2013 WL 1965996, at *14.

As later noted by the TCCA, the trial court failed to provide a contemporaneous limiting instruction admonishing that the disks of the forensic interviews could not be used to prove Petitioner's guilt. *Guilfoy v. State*, 2015 WL 4880182, at *11. And though the trial court later "instructed the jury that prior inconsistent statements could be used only to determine a witness's credibility,"[4] it "did not provide a similar instruction for prior consistent statements." *Id.*

The trial transcript does not indicate in any way whether or not the jury watched the forensic interview recordings during its deliberations. On direct appeal, the TCCA found as follows:

> Although the record clearly demonstrates that the trial court erred in admitting the recordings of the interviews into evidence,[5] the record does *not* demonstrate that the jury ever watched the interviews. Indeed, during closing argument, the prosecutor told the jury . . . that, in order to watch the recordings, the jury would have to request the appropriate equipment. The record contains no indication, however, that the jury ever requested the equipment. Nor does the record contain any other indication that the jury watched the recordings. The record is simply silent on this point.

*State v. Guilfoy*, 2013 WL 1965996, at *14. The TCCA proceeded to merge various convictions as previously described, but otherwise affirmed the trial court and remanded for resentencing in light of the mergers. *Id.* at *1, 24; (Doc. No. 37-19). On remand, the trial court sentenced Petitioner to 40 years' imprisonment. (Doc. No. 37-22 at 75.)

B. Proceedings on Post-Conviction Review

The TCCA summarized the record developed at the evidentiary hearing in the post-conviction trial court, as follows:

---

[4] (*See* Doc. No. 37-2 at 22 (jury charge instructing that "proof of any prior different statement may be considered by you only for the purpose of determining if the witness is telling the truth at trial. The contents of the prior inconsistent statement are not to be considered as proof in the trial").)

[5] It is unclear whether the TCCA found the admission erroneous because of the lack of a limiting instruction, because it was improper evidence of a prior consistent statement, or for another reason.

The Petitioner filed a petition for post-conviction relief alleging ineffective assistance of counsel. At the post-conviction hearing, trial counsel testified that he did not object to the introduction of the recorded forensic interviews as substantive evidence at trial and that he did not request that a limiting instruction be given to the jury. Trial counsel recalled that he went through the forensic interviews and redacted any reference to incidents that happened outside of Davidson County or incidents that involved a third victim, A.A. He identified the portions of the interview that needed to be redacted by looking for references to A.A., to things "that 'happened at the new house,'" or to "things that 'happened where we live now.'" Trial counsel recalled that he redacted statements from T.A. regarding incidents that happened in Montgomery County. However, trial counsel admitted that the redacted version of the video included the following statement:

> Interviewer: Okay. So, you've told me about a time he put his hand in your pants and touched your private part and nothing went inside. And you told me about a couple of times when he touched your private part and his finger went inside.

Trial counsel confirmed that at least two of the three events included in the interviewer's summary occurred in Montgomery County.

Trial counsel explained that he did not object to the admission of the video-recorded forensic interview because he believed that, when a victim was impeached, the victim's prior consistent statements were admissible as to the subject of the victim's credibility. He expected the trial court to give a limiting instruction to the jury and failed to notice that no limiting instruction was given.

Trial counsel also recalled that controlled phone calls between the Petitioner and the victims' mother were introduced into evidence. Trial counsel did not file any pretrial motions to suppress the introduction of the phone calls, but he did redact the phone calls because they contained references to incidents that happened in Montgomery County. In a portion of the recorded phone calls, the Petitioner stated, "[H]ad said it was me?" In the redacted version, a portion of what the victims' mother said to the Petitioner immediately before he made that statement was removed. Trial counsel agreed that, taken out of context, the Petitioner's statement could have been characterized as having a guilty mind. Trial counsel stated that his failure to redact that portion of the recorded phone call must have been an oversight.

Trial counsel also admitted that the unredacted phone calls included a statement from the Petitioner where he admits that he woke up one time to find T.A. on top of him. When he attempted to push her off of him, his fingers went inside her underwear. This incident occurred in Montgomery County. In the redacted version, the location of the incident was taken out, but the details of the incident remained.

Trial counsel explained that his theory of defense during the second trial was to demonstrate "the implausibility of the allegations" against the Petitioner. Trial

counsel recalled that, during the first trial, he extensively cross-examined the victims' mother about the particular dates the incidents were alleged to have occurred. Trial counsel used a large poster board to create a diagram of the alleged dates and then, through other witnesses, demonstrated that the Petitioner was not in Nashville on the dates in question. However, trial counsel did not use the same technique during the second trial. He explained:

> My thinking was, the lack of specificity, with regard to dates, was a weakness in the State's case for the first trial. And in the second trial, obviously, they would fix that, they would be prepared for what I was doing. So, my thinking was, the second trial we would present our case differently, because if we tried the same case twice the State would be able to anticipate everything we did.

Trial counsel also recalled that the State's direct examination of the victims' mother was essentially the same in each trial. Trial counsel agreed that he could have addressed in the second trial the issue of dates in order to demonstrate the implausibility of the allegations against the Petitioner.

Trial counsel also confirmed that he did not object to the respective testimony of Ms. Gallion and Ms. Post. He agreed that their respective testimony could have bolstered the victim[s]' testimony.

On cross-examination, trial counsel stated that he was one of about six attorneys who regularly represented clients charged with child sex abuse. He stated that it was common for there to be no unbiased adult eyewitnesses in such cases. Often, such cases turned on the victim's credibility. Trial counsel recalled that the State's general practice in such cases would be to have the nurse practitioner qualified as an expert witness, but he did not know whether the forensic interviewer was qualified as an expert. He also recalled that he met with the prosecutor about redacting statements from the recorded phone calls, and the prosecutor agreed to "redact everything we wanted redacted."

Kathleen Byers, the Petitioner's sister, testified that she was present at both trials. After the jury was released to deliberate in the second trial, Ms. Byers asked trial counsel if she had time to get lunch before the jury returned. Trial counsel told her that she likely did because the jurors had requested that a TV and viewing equipment be brought into the jury room so they could "watch the video."

*Guilfoy*, 2015 WL 4880182, at *7–8.

In addition to Ms. Byers's testimony, "Petitioner sought to have the jury foreperson testify at the post-conviction hearing that the jury had viewed the recordings of the forensic interviews during its deliberations, but the post-conviction court ruled her testimony inadmissible" and

Petitioner did not appeal that ruling. *Guilfoy*, 2018 WL 3459735, at *2; (*see* Doc. No. 37-23 at 3–8).

C. Proceedings on Petition for Writ of Error Coram Nobis

On January 17, 2017, Petitioner filed his coram nobis petition based on what he described as "newly discovered evidence" in the form of the jury foreperson's December 15, 2016 affidavit, which (according to Petitioner) "unequivocally establishes that the forensic videos were shown to the jury in the jury . . . room during the course of deliberations at the request of the jury foreperson." (Doc. No. 37-40 at 49, 67–68.) Petitioner further alleged that he had hired a private investigator after he was convicted, and that the investigator had issued a written report on November 30, 2011 stating "that he had succeeded in speaking to several jurors and had ascertained that the jury had, in fact, watched the forensic videos during their deliberations." (*Id.* at 56–57.) The trial court granted the State's motion to dismiss the coram nobis petition based on the statute of limitations, finding that the petition was filed nearly five years after the limitations period expired, that there were no grounds for tolling, and that there were "no due process concerns which would entitle petitioner to relief." (*Id.* at 116–18.)

On appeal, the TCCA affirmed the dismissal of the petition, finding as follows:

The State raised the statute of limitations as an affirmative defense in the coram nobis court, and the coram nobis court concluded that the petition was time-barred. We agree with the coram nobis court's conclusion. The Petitioner's grounds for relief were not "later-arising." In fact, the Petitioner conceded in his petition that he was aware that the jury had viewed the forensic interviews during its deliberations as early as November 2011. Therefore, we conclude that due process does not require tolling of the statute of limitations.

Moreover, the petition for writ of error coram nobis failed to state a cognizable claim for relief. Coram nobis relief is not available for matters which could have been raised in a motion for new trial, on direct appeal, or in a petition for post-conviction relief. *Freshwater v. State*, 160 S.W.3d 548, 556 (Tenn. Crim. App. 2004). Here, the issue was raised in the Petitioner's motion for new trial, on direct appeal, at his post-conviction proceedings, and in an appeal of his post-conviction

proceedings. As such, the petition failed to present any subsequent or newly discovered evidence that could not have been raised in an earlier proceeding.

Much of the Petitioner's brief is focused on the fact that the record was insufficient for this court to determine on direct appeal if the jury viewed the forensic interviews during its deliberations and the fact that the post-conviction court barred the foreperson of the jury from testifying at the post-conviction hearing. However, a petition for writ of error coram nobis is not the proper forum to address these issues.

With respect to the record on direct appeal, it is the appellant's "duty to prepare a record which conveys a fair, accurate[,] and complete account of what transpired with respect to the issues forming the basis of the appeal." *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993). To the extent that either trial or appellate counsel failed to adequately preserve the issue in the appellate record, a post-conviction claim of ineffective assistance of counsel would have been the proper avenue to address their deficiencies in compiling the appellate record. *See Laquan Napoleon Johnson v. State*, No. M2014-00976-CCA-R3-ECN, 2015 WL 1517795, at *4 (Tenn. Crim. App. Mar. 31, 2015) (noting that a claim of ineffective assistance of counsel "is not an appropriate ground for relief" in a coram nobis proceeding).

Likewise, any challenge to the post-conviction court's ruling on the admissibility of the jury foreperson's testimony at the post-conviction hearing should have been raised on appeal from that court's denial of post-conviction relief. Accordingly, we conclude that the coram nobis court did not abuse its discretion in denying the petition for writ of error coram nobis as time-barred and for failing to state a cognizable claim for coram nobis relief.

*Guilfoy v. State*, 2018 WL 3459735, at *3.

### III. CLAIMS OF THE AMENDED PETITION

The Amended Petition asserts the following three claims:

(1) Petitioner was deprived of his right to the effective assistance of trial counsel under the Sixth and Fourteenth Amendments when "his trial attorney failed to prevent the jury from viewing the out-of-court videotaped forensic interviews of the alleged victims," which "were never published in open court and not properly admitted into evidence," but were inadmissible under state law, were not produced to the defense prior to trial, and were "misleadingly and improperly redacted, and . . . improperly bolstered the alleged victims' accusations." (Doc. No. 31 at 7.)

(2) Petitioner was deprived of his Sixth and Fourteenth Amendment rights "to an impartial jury, confrontation, cross examination, and the assistance of counsel" when the trial court allowed the videos of J.A. and T.A.'s forensic interviews to be viewed in the jury room during deliberations. (*Id.* at 12.)

(3) Petitioner was deprived of his right to the effective assistance of trial counsel under the Sixth and Fourteenth Amendments when counsel failed to object to improper opinion testimony from non-expert Ann Post that "many things," including trauma, can disrupt a child's memory of "an abuse event," when that testimony "served to dispel any inconsistencies and improbabilities in [the] testimony" of J.A. and T.A., upon whose credibility the prosecution hinged. (*Id.* at 15–16.)

## IV. ANALYSIS

A. <u>Legal Standard</u>

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Upon finding a constitutional error on habeas corpus review, a federal court may grant relief only if it finds that the error "had substantial and injurious effect or influence" upon the conviction. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Peterson v. Warren*, 311 F. App'x 798, 803–04 (6th Cir. 2009).

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and federalism.'" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 436 (2000)). AEDPA's requirements "create an independent, high standard to be met

before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551 U.S. 1, 10 (2007) (citations omitted). As the Supreme Court has explained, AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)). Prior to the passage of AEDPA, district courts applied de novo review to determine whether "the relevant state court had erred on a question of constitutional law or on a mixed constitutional question." *Williams v. Taylor*, 529 U.S. 362, 402 (2000) (O'Connor, J., concurring). But now, where state courts have ruled on the merits of a claim, AEDPA imposes "a substantially higher threshold" for obtaining relief than a de novo review of whether the state court's determination was incorrect. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

Specifically, a federal court may not grant habeas relief on a claim that was rejected on the merits in state court, unless the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). The Supreme Court has repeatedly held "that AEDPA, by setting forth [these] necessary predicates before state-court judgments may be set aside, 'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court.'" *White v. Wheeler*, 577 U.S. 73, 77 (2015) (quoting *Burt v. Titlow*, 571 U.S. 12, 19 (2013)).

A state court's legal decision is "contrary to" clearly established federal law under Section 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme]

Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13. An "unreasonable application" under this subsection occurs when "the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413; *White v. Woodall*, 572 U.S. 415, 426 (2014). A state court decision is not unreasonable under this standard simply because the federal court, "in its independent judgment," finds it erroneous or incorrect. *Williams*, 529 U.S. at 411. Rather, to be actionable under Section 2254(d)(1), the state court's decision "'must be objectively unreasonable, not merely wrong; even clear error will not suffice.'" *Woods v. Donald*, 575 U.S. 312, 316 (2015) (quoting *Woodall*, 572 U.S. at 419). An objectively unreasonable decision is one "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.[6]

Similarly, a district court on habeas review may not find a state court factual determination to be unreasonable under Section 2254(d)(2) simply because it disagrees with the determination. *Young v. Hofbauer*, 52 F. App'x 234, 237 (6th Cir. 2002). Rather, the determination must be "objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). "If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the [state] court's . . . determination." *Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)) (internal quotation marks omitted). Moreover, a state court's factual determinations "shall be presumed to be correct," and the petitioner bears "the burden of rebutting

---

[6] The upshot appears to be that objectively unreasonable decisions necessarily include decisions that are clearly erroneous, but decisions that are not clearly erroneous are not necessarily unreasonable. To be objectively unreasonable, the state court decision must be *so* unjustified that its erroneousness cannot be denied by fairminded jurists.

the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Davis v. Ayala*, 576 U.S. 257, 271 (2015) ("State-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'") (quoting *Rice v. Collins*, 546 U.S. 333, 338–39 (2006)). Finally, the petitioner may not prevail under Section 2254(d)(2) simply by showing that a fact was unreasonably determined; he "must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011).

The standard set forth in 28 U.S.C. § 2254(d) for granting relief on a claim that was rejected on the merits by a state court "is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Richter*, 562 U.S. at 102, and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). This standard "was meant to be" a high hurdle for petitioners, consistent with the principle that habeas corpus functions as a guard against only "*extreme* malfunctions" in the state's administration of criminal justice. *Harrington*, 562 U.S. at 102 (emphasis added); *see also Woods*, 575 U.S. at 316.

Review under AEDPA is not only demanding, but also ordinarily unavailable to state inmates who have not fully exhausted their remedies in the state court system. Title 28, United States Code, Sections 2254(b) and (c) provide that, subject to certain exceptions, a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless the prisoner has presented the same claim sought to be redressed in a federal habeas court to the state courts. *Pinholster*, 563 U.S. at 182; *Kelly v. Lazaroff*, 846 F.3d 819, 828 (6th Cir. 2017) (quoting *Wagner v. Smith*, 581 F.3d 410, 417 (6th Cir. 2009)) (federal claim is exhausted if it was presented "under the same theory" in state court). This rule has been interpreted by the Supreme Court as one of total

exhaustion, *Rose v. Lundy*, 455 U.S. 509 (1982), meaning that, as of the time of the habeas petition's filing, there can no longer be any available state remedy for any of its claims; if a state remedy is available for any habeas claim, the entire petition must be dismissed. *Id.* at 522. A habeas petition is thus fully exhausted if (and only if) each and every claim was first fairly presented to the state appellate court[7] as a federal constitutional claim in substance, if not explicitly. *See Gray v. Netherland*, 518 U.S. 152, 162–63 (1996); *Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (requiring the presentation of "the legal and factual substance of every claim to all levels of state court review").

However, because the exhaustion requirement "refers only to remedies still available at the time of the federal petition," it may also be "satisfied if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law." *Gray*, 518 U.S. at 161 (citations and internal quotation marks omitted). The doctrine of procedural default is thus a corollary to the rule of exhaustion, one which ordinarily bars habeas review of claims that were not "fairly presented" for merits review in state court, either because they were presented in a way that failed to comport with state procedural rules or because they were not presented at all and no longer can be presented under state law. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (acknowledging "the interplay of these two doctrines" and stating that, to avoid an end-run around the exhaustion requirement and "the values that it serves," "we ask not only whether a prisoner has exhausted his state remedies, but also whether he has *properly* exhausted those remedies, i.e., whether he has fairly presented his claims to the state courts.") (emphasis in original; internal citations and quotation marks omitted). If the state court decides a claim on "adequate and independent state grounds"—

---

[7] In Tennessee, the Court of Criminal Appeals is the highest appellate court to which appeal must be taken in order to properly exhaust a claim. *See* Tenn. Sup. Ct. R. 39; *Adams v. Holland*, 330 F.3d 398, 402–03 (6th Cir. 2003).

typically a procedural rule prohibiting the state court from reaching the merits of the constitutional claim—the claim will ordinarily be barred from federal habeas review based on procedural default. *Wainwright v. Sykes*, 433 U.S. 72, 81–82 (1977*); see also Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment."); *Coleman v. Thompson*, 501 U.S. 722 (1991) (same). Likewise, if a claim has never been presented to the state courts, but a state court remedy is no longer available (*e.g.*, when an applicable statute of limitations bars a claim or state law deems the claim waived),[8] then the claim is technically (though not properly) exhausted but barred by procedural default. *Coleman*, 501 U.S. at 731–32.

If a claim is procedurally defaulted, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Id.* at 750. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (citing *Coleman*, 501 U.S. at 754). "'[C]ause' under the cause and prejudice test must be something *external* to the petitioner, something that cannot fairly be attributed to him[,] . . . some objective factor external to the defense [that] impeded . . . efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753 (emphasis in original). Examples of cause include the

---

[8] The Tennessee Post-Conviction Procedure Act provides that "[i]n no event may more than one (1) petition for post-conviction relief be filed attacking a single judgment," and establishes a one-year limitations period for filing that one petition. Tenn. Code Ann. § 40-30-102(a) and (c). The Act further provides that "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented," unless that ground could not be presented due to unconstitutional state action, or is based on a new and retroactive constitutional right that was not recognized at the time of trial. *Id.* § 40-30-106(g).

unavailability of the factual or legal basis for a claim or interference by officials that makes compliance "impracticable." *Id.* To establish prejudice, a petitioner must demonstrate that the constitutional error asserted in his defaulted claim "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)); *see also Ambrose v. Booker*, 684 F.3d 638, 649 (6th Cir. 2012) (finding that "having shown cause, petitioners must show actual prejudice to excuse their default"). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000). Likewise, if a petitioner cannot establish prejudice, the question of cause need not be addressed.

Because the "cause and prejudice" standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a "narrow exception" to the bar of an unexcused default, one that applies in (and only in) a case where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392–93 (2004) (citing *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986)); *accord Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006). To obtain habeas review under this narrow exception to the procedural-default rule, a petitioner must demonstrate his factual innocence, not the mere legal insufficiency of the State's proof; a miscarriage-of-justice claim is not supported by an assertion of mere legal innocence.[9] *Lee v. Brunsman*, 474 F. App'x 439, 442 (6th Cir. 2012) (citing *Bousley v. United States*, 523 U.S. 614, 623 (1998), and *Calderon v. Thompson*, 523 U.S. 538, 559 (1998)).

---

[9] The distinction here is between the defendant not actually having committed the crime as defined by all of its elements (*i.e.*, not all acts necessary to committing the crime having actually occurred, and/or not all circumstances necessary to make these acts a crime having actually existed) and the defendant not having been proven in all respects to have committed the crime (i.e., the Government not having established the occurrence of all acts necessary to committing the crime and all circumstances necessary to make those acts a crime).

B. Petitioner's Claims

As recited above, the Amended Petition presents two claims of ineffective assistance of counsel (Claims 1 and 3) and one claim of trial court error (Claim 2). Respondent concedes that the ineffective-assistance claims were fully exhausted in state court (*see* Doc. No. 39 at 18, 33) and defends their state-court, on-the-merits resolution against Petitioner under AEDPA's standards applicable to such resolutions. Respondent raises procedural defenses to Petitioner's claim of trial court error (*id.* at 29–32), arguing on that basis that the Court should not reach its merits. The Court begins with an analysis of Claim 2's procedural viability.

1. *Claim 2 – Trial Court Error*

As noted above, Petitioner asserts that the trial court's permitting the jury to view the forensic interview videos violated his rights "to an impartial jury, confrontation, cross examination, and the assistance of counsel." (Doc. No. 31 at 12.)[10] Respondent argues that this claim was not, and no longer properly can be, presented in state court and therefore is technically exhausted but procedurally defaulted. Respondent asserts that Petitioner's coram nobis proceedings do not preclude a finding of default of the impartial-jury component of the claim, because coram nobis proceedings are "not a means for exhausting a federal claim." (Doc. No. 39 at 29.) He further asserts that Petitioner failed entirely to present in state court his claim that he

_____

[10] The Court construes the portion of this claim asserting rights to "confrontation, cross examination, *and the assistance of counsel*" as seeking to vindicate Petitioner's right, through counsel, to confront and cross-examine the witnesses against him. Neither the Amended Petition (Doc. No. 31 at 12–14) nor the supporting Memorandum (Doc. No. 32 at 44–52) develop the factual basis for any other argument that allowing the videos into the jury room deprived Petitioner of the assistance of counsel, outside of counsel's role in confronting and cross-examining adverse witnesses. *See* Rule 2(c), Rules Gov'g § 2254 Cases (requiring that a petition must "specify all the grounds for relief available to the petitioner" and "state the facts supporting each ground"). The invocation of the Sixth Amendment right to assistance of counsel therefore does not add anything substantively to this claim. Accordingly, the Court here does not separately consider here any argument concerning the denial of counsel's assistance, although the Court does acknowledge that the actual claim here—an alleged violation of Petitioner's right to confront and cross-examine witnesses against him—does encompass some notion that his counsel was prevented from being effective in the confrontation and cross-examination that Petitioner says was wrongfully denied to him

was deprived of his right to have counsel confront and cross-examine the victims regarding their statements in the recorded interviews.

> a. Claim to Denial of Impartial Jury: Presented in State Court but Procedurally Barred

"The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to a trial 'by an impartial jury.'" *Smith v. Nagy*, 962 F.3d 192, 199 (6th Cir.), *reh'g denied* (July 1, 2020), *cert. denied*, 141 S. Ct. 634 (2020) (quoting U.S. Const. amend. VI). "This guarantee requires a jury to arrive at its verdict 'based upon the evidence developed at the trial.'" *Id.* (quoting *Turner v. Louisiana*, 379 U.S. 466, 472 (1965)). Accordingly, in cases where "an extraneous or external influence on the jury" is alleged, post-verdict proceedings may be required to protect the defendant's constitutional rights. *Id.* at 200–01.

Petitioner's claim that the jury's exposure to allegedly extraneous information (i.e., information not brought to light in the courtroom during the trial) in the forensic interview videos violated his federal rights was first raised by him during state coram nobis proceedings.[11] In his coram nobis petition, Petitioner claimed that the jury's exposure to "prejudicial extraneous information" in the videos undermined the fairness of his trial (*see* Doc. No. 37-40 at 48–50, 63–64), and on appeal from the denial of that petition, he argued that his right to a fair trial by an

---

[11] Although Petitioner also argued in his brief on direct appeal to the TCCA that his trial was "fundamentally unfair" because of the admission in evidence of the video interviews, in violation of his "state and federal constitutional right to the due process of law and to a fair trial," citing, *inter alia*, the "5th, 6th and 14th Amendments to the United States . . . Constitution" (Doc. No. 37-15 at 60), he does not claim to have exhausted any of his federal habeas claims on direct appeal. Nor would this mere mention of the Sixth Amendment and fundamental fairness suffice to fairly present his impartial-jury claim, as Petitioner's principal argument on direct appeal was that the recorded statements were inadmissible hearsay under the Tennessee Rules of Evidence, and his reference to the Federal Constitution was made in support of an alternative argument—necessitated by trial counsel's failure to object to the videos' admission—that the standard for plain-error review of the evidentiary issue was met. (*See id.* at 54–58.) A finding that the standard for plain-error review is not met, as made by the TCCA in Petitioner's direct appeal, is itself an independent and adequate state ground for declining to reach the merits of a federal claim, sufficient to preclude habeas review. *See Beverly v. Macauley*, No. 20-1384, 2022 WL 842301, at *5 (6th Cir. Mar. 22, 2022); *Morgan v. Pierce*, 83 F. Supp. 3d 563, 569 (D. Del. 2015).

impartial jury was compromised by the jury's exposure to those videos. (*See* Doc. No. 37-43 at 21–22.) Although Respondent asserts that a federal habeas claim may not be exhausted in state coram nobis proceedings, he does not cite any authority for that proposition, nor is the Court aware of any. It thus appears, and the Court finds, that Petitioner fairly presented to the state courts the component of Claim 2 that asserts the denial of his right to an impartial jury when the trial court allowed the previously unpublished videos to be viewed during deliberations.

However, the state courts at both the trial and appellate levels rejected Petitioner's coram nobis petition as untimely under the applicable state statute of limitations. (*See* Doc. No. 37-40 at 116–18) (applying Tenn. Code Ann. § 27-7-103); *Guilfoy*, 2018 WL 3459735, at *2 (same). Thus, although the impartial-jury claim was presented to the state courts, its merits were avoided due to "the application of the statutory coram nobis limitations period[,] [which] is an adequate and independent state ground for rejection of a claim" that renders the claim "procedurally defaulted and not subject to federal habeas review" unless the default can be excused. *Carson v. Genovese*, No. 3:15-CV-01121, 2021 WL 1564764, at *16 (M.D. Tenn. Apr. 21, 2021).

Petitioner has offered no viable grounds for excusing the default of this claim, which was raised too late in coram nobis and, as pointed out by the TCCA on coram nobis appeal, was based on juror testimony that could have been offered prior to post-conviction proceedings or pursued on appeal from the post-conviction court's order disallowing it. *Guilfoy*, 2018 WL 3459735, at *3 (finding that "Petitioner's grounds for relief were not 'later-arising'" and could not toll running of limitations period, as he purportedly "was aware that the jury had viewed the forensic interviews during its deliberations as early as November 2011" and could have appealed the post-conviction court's refusal to allow juror to testify at evidentiary hearing). Petitioner does not identify any "objective factor external to the defense" that obstructed these routes toward exhausting a claim

that the jury had, in fact, viewed the videos and was thereby prejudiced against him. *Coleman*, 501 U.S. at 753. While he argues that his post-conviction attorney's ineffectiveness may suffice as cause to excuse the default of this claim, even though the claim itself is not an ineffective-assistance-of-trial-counsel claim (*see* Doc. No. 52 at 19–23 (citing "the legal principles underpinning the decision" in *Martinez v. Ryan*, 566 U.S. 1 (2012)[12])), this argument was squarely rejected by the U.S. Supreme Court in *Davila v. Davis*, 137 S. Ct. 2058 (2017). In *Davila*, the Supreme Court first observed that "[i]t has long been the rule that attorney error is an objective external factor providing cause for excusing a procedural default only if that error amounted to a deprivation of the constitutional right to counsel." 137 S. Ct. at 2065. It then held that "*Martinez*'s highly circumscribed, equitable exception" to that rule in cases where counsel on post-conviction review (where there is no constitutional right to counsel) ineffectively failed to present a claim of ineffective assistance of trial counsel could not be expanded, based on the "underlying rationale of *Martinez*," to apply to defaulted claims that are not ineffective-assistance-of-trial-counsel

---

[12] The Supreme Court previously held, in *Coleman v. Thompson* that, because there is no constitutional right to counsel in state post-conviction proceedings, any attorney error at that stage that leads to the waiver of claims in state court "cannot constitute cause to excuse the default in federal habeas." 501 U.S. at 752, 757. However, in *Martinez v. Ryan*, the Supreme Court modified "the unqualified statement in *Coleman* that an attorney's ignorance or inadvertence in a postconviction proceeding does not qualify as cause to excuse a procedural default," "by recognizing a narrow exception: Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 566 U.S. at 9. This exception stems from the recognition, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim" of trial counsel's ineffectiveness, when that claim could not have been raised on direct appeal because of state procedural rules. *Id.* at 13. In *Trevino v. Thaler*, 569 U.S. 413 (2013), the Supreme Court extended the applicability of the *Martinez* exception to states with procedural frameworks that do not preclude an ineffective-assistance claim on direct appeal, but make it unlikely that the opportunity to raise that claim at that time will be a meaningful one. *Id.* at 429. The Sixth Circuit held in *Sutton v. Carpenter*, 745 F.3d 787 (6th Cir. 2014), that under Tennessee's procedural scheme, the initial post-conviction proceeding is the first meaningful opportunity to raise a claim of ineffective assistance of trial counsel. *Id.* at 795–96. Thus, for each defaulted claim of ineffective assistance at trial, a Tennessee petitioner may overcome the default under *Martinez* if he can show that the default resulted from his initial post-conviction counsel's ineffectiveness under *Strickland*'s standards, and that the underlying claim of trial counsel's ineffectiveness is a "substantial one, which is to say that . . . the claim has some merit." *Martinez*, 566 U.S. at 13–14.

claims. *Id.* at 2065–66. Here, Petitioner seeks just such an expansion by appealing to "the legal principles underpinning" *Martinez*, so that the default of his impartial-jury claim may be excused based on post-conviction counsel's ineffectiveness. *Davila* forecloses this attempt to demonstrate cause.

Petitioner has thus failed to demonstrate cause excusing the procedural default of his impartial-jury claim. Moreover, as discussed below, Petitioner misses the mark with his contention that the State may be judicially estopped from asserting this procedural defense in the first place. Habeas review of the impartial-jury claim is thus barred.

### b. Claim to Denial of Right to Have Counsel Confront and Cross-Examine Witnesses: Technically Exhausted but Denied on Adequate and Independent State Grounds

The Sixth Amendment's Confrontation Clause establishes the right of criminal defendants to cross-examine and "impeach, i.e., discredit, the [state's] witness[es]." *Blackston v. Rapelje*, 780 F.3d 340, 348–49 (6th Cir. 2015) (quoting *Davis v. Alaska*, 415 U.S. 308, 316 (1974)). Petitioner claims that permitting the jury to view the forensic interview videos for the first time in deliberations deprived him of this right. Respondent argues that this claim was not raised before the State courts and was therefore defaulted, and that Petitioner has failed to demonstrate cause for the default. In reply, Petitioner argues that Respondent should be estopped from relying on this procedural defense due to the State's opposition to Petitioner's efforts in state court to introduce evidence that the jury had in fact viewed the videos, as required to support any state-court claim he might have made with respect to confrontation and cross-examination. Alternatively, Petitioner argues that cause for the default may be found in both the State's efforts to block development of the record and his post-conviction attorney's ineffectiveness in failing to raise the claim.

Judicial estoppel "forbids a party from taking a position inconsistent with one successfully and unequivocally asserted by that same party in an earlier proceeding." *McMeans v. Brigano*, 228 F.3d 674, 686 (6th Cir. 2000) (citation omitted). "The purpose of the doctrine is to protect the integrity of the judiciary by preventing a party from convincing two different courts of contradictory positions, which would mean that one of those two courts was deceived." *Audio Technica U.S., Inc. v. United States*, 963 F.3d 569, 575 (6th Cir. 2020). But judicial estoppel is to be "applied with caution . . . because the doctrine precludes a contradictory position without examining the truth of either statement." *Teledyne Indus., Inc. v. N.L.R.B.*, 911 F.2d 1214, 1218 (6th Cir. 1990).

Petitioner cites a Ninth Circuit case, *Russell v. Rolfs*, 893 F.2d 1033 (9th Cir. 1990), for the proposition that judicial estoppel may be used to overcome the State's assertion of procedural default in habeas proceedings. (Doc. No. 82 at 17.) However, the Sixth Circuit in *McMeans*, 228 F.3d at 686, declared that it was not "inclined to follow the Ninth Circuit's methodology in *Russell*," and found the case before it otherwise distinguishable. In *Russell*, the state won dismissal of Russell's first federal habeas petition by asserting that he had an available state remedy to pursue, which "was tantamount to advising the federal district court that Russell would be given a hearing in state court on the merits of his claims." *Russell*, 893 F.3d at 1037–38. But when Russell returned to state court, "the state disregarded its previous representation in federal court and argued the petition was procedurally barred because Russell had raised the same issues on direct appeal," and his state petition was dismissed. *Id.* at 1037. Russell then filed a second federal habeas petition, and the state argued that his claims were barred by procedural default given the dismissal it had just won in state court. *See id.* at 1037–38. But because "[t]he state prevailed by telling the state court the opposite of what it told the federal court," the Ninth Circuit found that the state should

be estopped from asserting procedural default in response to the petitioner's second habeas filing. *Id.* at 1038–39. In *McMeans*, by contrast, the state's attorney "did not make any misrepresentation that the Ohio courts could or would consider the juror-bias claim in a state postconviction proceeding," so no inconsistency arose when he later asserted that the juror-bias claim had been defaulted. 228 F.3d at 686.

Here, as in *McMeans*, the State's current assertion of procedural default is not inconsistent with its earlier positions that Petitioner was not entitled to a copy of the videos in pretrial discovery, that the proffered juror testimony was inadmissible at the post-conviction evidentiary hearing, or that the juror's affidavit was unreviewable on timeliness grounds in coram nobis proceedings. Courts asked to apply judicial estoppel must consider whether the party's prior and current positions are "clearly inconsistent." *Shufeldt v. Baker, Donelson, Bearman, Caldwell & Berkowitz, PC*, 855 F. App'x 239, 243 (6th Cir.), *cert. denied sub nom. Baker v. Shufeldt*, 142 S. Ct. 347 (2021) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001)) (finding clear inconsistencies between prior argument that claims were timely and later argument that "the statutes of limitations on [those] claims . . . [had] expired"). Here, the State's position in state court was, in effect, that Petitioner *could* not succeed in asserting any claims—including a Confrontation Clause claim—related to the jury's viewing of the videos (because, according to the State, Petitioner could not lay a foundation for any such claims); by contrast, the State's position in this Court is that Petitioner ultimately *did* not succeed in asserting his Confrontation Clause claim in state court and therefore defaulted that claim. The difference between these two stances is more temporal than positional; they are certainly not diametrically opposed. In other words, the State has not attempted to "convince[e] two different courts of contradictory positions." *Audio Technica*,

963 F.3d at 575. Because there is no prior "inconsistent position to which the respondent must now adhere," *McMeans*, 228 F.3d at 686, judicial estoppel is inappropriate.

Petitioner's other cause grounds fare no better. Petitioner argues that the default was caused by the trial court's failure to preserve a record of the jury's request for equipment to view the interviews, but that assertion assumes (based on after-acquired testimonial evidence) that the jury actually made that request. That assumption is problematic in the context of analyzing procedural default because the requesting juror's affidavit testimony was never properly introduced in state court, which had a silent record from which it was invited to presume that the recordings were played in the jury room. The TCCA has declined to make such a presumption in this and other cases.[13] *See State v. Overholt*, No. E2003-01881-CCA-R3-CD, 2005 WL 123483, at *4 (Tenn. Crim. App. Jan. 21, 2005) (denying relief to defendant who inferred that "the jury requested audiotape playing equipment" during deliberations and "listened to the tapes," when "[t]he record reveal[ed] no request by the jury for audiotape playing equipment"). Moreover, Petitioner's assertion of cause here amounts to the non-sensical proposition that the state-court record's failure to reflect any request by the jury to view the videos caused his failure to present his claim in state court, even though he supposedly had *independent* knowledge that the jury made the request that the state court failed to record—in which case he would not have needed to have relied on any state-court record to inform him that grounds existed to file such a claim. His default cannot be excused on this basis.

---

[13] The TCCA on direct appeal rejected the invitation to presume that the jury viewed the videos and to treat such a presumption "as an adequate means of satisfying the first prerequisite of plain error review," *i.e.*, that "the record clearly establishes what occurred in the trial court." *State v. Guilfoy*, 2013 WL 1965996, at *13, 14 n.5. On post-conviction appeal, the court appears to have indulged this presumption for purposes of analyzing trial counsel's effectiveness. *Guilfoy v. State*, 2015 WL 4880182, at *11–12 & n.4 (noting "the post-conviction testimony of Ms. Byers that trial counsel told her she had time to get lunch because the jury had requested equipment to view the video").

Even if the juror affidavit had been properly introduced in state court, it does not reflect that the juror made a written request to the court for video playback equipment; rather, it describes a brief, verbal request to "an individual who [the juror] believe[d] was a court officer." (Doc. No. 37-40 at 68.) The fact that neither the court officer nor the trial court itself noted for the record that such equipment had been requested in this way would not amount to external "interference by officials" that prevented Petitioner from raising his constitutional claims, *see Coleman*, 501 U.S. at 753 (stating that "cause" may be found in "some objective factor external to the defense," such as when "interference by officials . . . made compliance 'impracticable'") (citations omitted), particularly as Petitioner's counsel would have been complicit in the record's silence by not objecting when the videos were admitted into evidence or when the prosecutor, during closing argument, invited the jury to request that viewing equipment be brought to the jury room during deliberations.[14]

Petitioner additionally asserts that cause for the default may be found in the State's objection to the juror testimony proffered at the post-conviction evidentiary hearing. But that objection was sustained under state law (*see* Doc. No. 37-23 at 3–8) and Petitioner did not challenge that ruling on appeal. The post-conviction trial court agreed with the State that Tennessee Rule of Evidence 606(b)[15] barred the juror's testimony—even as an offer of proof for purposes of

---

[14] Petitioner separately claims that trial counsel was constitutionally ineffective in failing to object, but he does not assert this alleged ineffectiveness as cause excusing the default of Claim 2. Even if he had made this assertion, for trial counsel's ineffective assistance to qualify as cause excusing another claim's procedural default, "the assistance must have been so ineffective as to violate the Federal Constitution." *Edwards*, 529 U.S. at 451. As discussed later in this Memorandum Opinion, Petitioner has failed to establish the merit of his claim that trial counsel was constitutionally ineffective.

[15] That rule provides as follows:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the

appeal. (*See id.* at 6–7.) That ruling (one involving merely an application of state rules of evidence) is not fairly characterized as State conduct that impeded post-conviction counsel's access to the factual basis for making a Sixth Amendment claim, and thus cannot establish cause for the default. *Cf. Strickler v. Greene*, 527 U.S. 263, 283 (1999) (finding that type of impediment to factual development that would ordinarily establish cause for procedural default existed where prosecutor failed to disclose *Brady* material, while offering "open file" discovery that "did not include all it was purported to contain"). Nor can post-conviction counsel's alleged ineffectiveness excuse the failure to exhaust these claims of trial-court error, as discussed above. Habeas review of the confrontation and cross-examination claims is thus barred.

In sum, because of its unexcused procedural default, Claim 2 of the Amended Petition is not subject to further review.

Alternatively, even if Claim 2 had been properly exhausted, and even though Respondent did not argue its merits, the Supreme Court has unambiguously established that the Confrontation Clause of the Sixth Amendment—unlike the general rule against hearsay—"prohibits [only] the introduction of [prior] testimonial statements by a *nontestifying* witness." *Ohio v. Clark*, 576 U.S. 237, 243 (2015) (emphasis added) (citing *Crawford v. Washington*, 541 U.S. 36, 54 (2004)); *Crawford*, 541 U.S. at 59 n.9 ("Finally, we reiterate that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior

---

effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Tenn. R. Evid. 606(b).

testimonial statements. It is therefore irrelevant that the reliability of some out-of-court statements cannot be replicated, even if the declarant testifies to the same matters in court. The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it.") (citations and internal quotation marks omitted). Thus, assuming *arguendo* that the statements recorded on the forensic interview videos were testimonial, the Confrontation Clause did not prohibit their introduction because J.A., T.A., and Ms. Post were all live witnesses who were, or who could have been, cross-examined during Petitioner's trial.

Moreover, as discussed in further detail below with regard to Petitioner's non-defaulted claims, the videos had been redacted at trial counsel's request, were properly authenticated, and were admitted without objection at Petitioner's trial,[16] during which the interviews were briefly referred to in questions to the victims (both of whom affirmed the truth of their statements to the interviewer, Ms. Post). (Doc. No. 37-6 at 39–41, 78, 116–18; Doc. No. 37-7 at 14.) The videos were not extraneous to the record and thus did not compromise the jury's impartiality when mentioned during trial, or if viewed during deliberations. Accordingly, even were it not defaulted, Claim 2 would be subject to dismissal on its merits.

---

[16] This case is thus distinguishable from the cases cited in Petitioner's supporting Memorandum, which involved the inspection of audio tapes or other items in the jury room despite the fact that they had not been offered or admitted as evidence in the case, leading to a finding of "structural error" in *United States v. Noushfar*, 78 F.3d 1442, 1445–46 (9th Cir. 1996), and "clear error" in *United States v. Hans*, 738 F.2d 88, 92–93 (3d Cir. 1984). In *Noushfar*, the district court had allowed the jury to take to the jury room fourteen audio tapes, recorded by government agents, that had not been played in the courtroom. These tapes were allowed into the jury room over the defendant's "vigorous objections," as they contained incriminating statements made to government agents by the defendants themselves; their consideration by the deliberating jury was found to violate Federal Rule of Criminal Procedure 43 "and, possibly, the Confrontation Clause." 78 F.3d at 1444–45. In *Hans*, the items allowed into the jury room had been ruled admissible in a pretrial hearing and marked for identification at trial, but were "never actually introduced into evidence." 738 F.3d at 92. The district court nonetheless granted the jury's request to have them brought to the jury room over Hans's "strenuous objections," which were understandable given that his lawyer had foregone the chance to elicit testimony which would have cast doubt upon the weight due such items in reliance on the prosecution's failure to move them into evidence. *Id.* The Court finds that both *Noushfar* and *Hans* are sufficiently distinguishable from Petitioner's case to be inapposite here.

## 2. *Claims 1 and 3 – Ineffective Assistance of Trial Counsel*

Petitioner asserts that he received ineffective assistance when "his trial attorney failed to prevent the jury from viewing the out-of-court videotaped forensic interviews of the alleged victims," which "were never published in open court and not properly admitted into evidence," but were inadmissible under state law, were not produced to the defense prior to trial, and were "misleadingly and improperly redacted, and . . . improperly bolstered the alleged victims' accusations." (Doc. No. 31 at 7.) Petitioner also asserts that counsel rendered ineffective assistance in failing to object to improper opinion testimony from non-expert Ann Post that "many things," including trauma, can disrupt a child's memory of "an abuse event," when that testimony "served to dispel any inconsistencies and improbabilities in [the] testimony" of J.A. and T.A., upon whose credibility the prosecution hinged. (*Id.* at 15–16.) Respondent acknowledges that these claims were exhausted in state court.

Claims of ineffective assistance of counsel are subject to the two-prong standard of *Strickland v. Washington*, 466 U.S. 668 (1984), which asks: (1) whether counsel was deficient in representing Petitioner; and (2) whether counsel's alleged deficiency prejudiced the defense so as to deprive Petitioner of a fair trial. *Id.* at 687. To meet the first prong, Petitioner must establish that his attorney's representation "fell below an objective standard of reasonableness," and must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, [he] must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" *Id.* at 688–89 (quoting *Michel v. State of La.*, 350 U.S. 91, 101 (1955)). The "prejudice" component of the claim "focuses on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding

fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). It requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

When an exhausted claim of ineffective assistance of counsel is raised in a federal habeas petition, review under AEDPA is "doubly deferential," *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009), in that "*Strickland* requires deference to counsel and AEDPA requires deference to the state court." *Moody v. Parris*, No. 20-5299, 2022 WL 3788503, at *4 (6th Cir. Aug. 30, 2022). The question then is not whether the petitioner's counsel was ineffective; rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. at 101. As the Supreme Court clarified in *Harrington*,

> This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Id.* (internal quotation marks and citation omitted). The TCCA correctly identified and summarized the *Strickland* standard applicable to Petitioner's claims of ineffective assistance. *Guilfoy v. State*, 2015 WL 4880182, at *9. Accordingly, the critical question is whether the TCCA applied *Strickland* reasonably in reaching its conclusions on each ground raised by Petitioner.

a. Claim 1 – Failure to Prevent Jury from Watching Forensic Interviews

It is undisputed that the forensic interview videos were not properly admitted into evidence at trial under state law. *See State v. Guilfoy*, 2013 WL 1965996, at *14 (stating that "the record

clearly demonstrates that the trial court erred in admitting the recordings of the interviews into evidence"). Petitioner, however, makes a preliminary argument that the interviews were not admitted into evidence *at all*, because they "were never played in open court." (Doc. No. 32 at 28 (citing *State v. Henry*, No. 02C01-9611-CC-00382, 1997 WL 283735, at *4 (Tenn. Crim. App. May 29, 1997)).) Instead, Petitioner claims, the interviews were entirely extraneous or external to the trial and therefore impermissibly tainted the jury's deliberations. (*Id.* at 28–29 (citing *Turner v. Louisiana*, 379 U.S. 466, 473 (1965) (holding that testifying officers' continuous and intimate association with jurors outside of the courtroom violated defendant's constitutional rights)).) Regardless of any procedural defects in this argument,[17] it does not withstand scrutiny.

The disks containing the forensic videos were formally admitted into evidence on the State's motion, after having previously been marked for identification only. The deliberating jury's examination of evidence admitted into evidence (erroneously or not) is different from its use of extraneous statements or materials in deliberations. *See United States v. Thomas*, 701 F. App'x 414, 421 (6th Cir. 2017) ("While the Constitution protects defendants from extraneous influences upon juries, jurors have free rein to examine the evidence admitted[.]"). In his supplemental notice

_____

[17] Petitioner did not argue this theory when he presented his ineffective-assistance claims to the TCCA. Instead, he argued (1) that the two videos were inadmissible both as substantive evidence and as impeaching evidence (*i.e.*, as bearing on witness credibility) since they were prior (consistent) statements that were not excepted from the hearsay rule (Doc. No. 37-30 at 38–47), and (2) that the video of T.A.'s interview was prejudicial because it compromised "his right to a unanimous verdict and his protections against double jeopardy." (*Id.* at 34–36, 48–49.) Though it thus does not appear that Petitioner exhausted the specific claim that counsel was ineffective in allowing the jury to view supposedly unadmitted (as opposed to *inadmissible*) evidence, Respondent waived any exhaustion defense when he cited the portions of Petitioner's filings where this claim was made and stated that the claim was exhausted in state court and "properly before this Court on habeas review." (Doc. No. 39 at 18); *see D'Ambrosio v. Bagley*, 527 F.3d 489, 497 (6th Cir. 2008) (stating that "[t]he touchstone for determining whether a waiver is express is the clarity of the intent to waive," and finding that the state clearly intended to waive exhaustion defense despite not using some form of the word "waive"; "AEDPA requires that the waiver be express, not expressed in a certain manner."). Although "[a] federal court may choose, in its sound discretion, to reject a state's waiver of either nonexhaustion or procedural default," *Pike v. Guarino*, 492 F.3d 61, 74 (1st Cir. 2007) (citing, *e.g.*, *Granberry v. Greer*, 481 U.S. 129, 134 (1987)), the Court does not find it appropriate here to disregard the State's waiver.

of additional authority (Doc. No. 55), Petitioner analogizes to *United States v. Craig*, 953 F.3d 898 (6th Cir. 2020), in which the Sixth Circuit on direct appeal reversed the appellant's conviction because the government showed an unauthenticated social-media video to the jury during cross-examination of the appellant, without requesting an instruction that it be considered only for impeachment purposes and without seeking to introduce the video into evidence—only to have the jury request to see the unadmitted video again during deliberations before convicting the appellant. However, the court's decision in *Craig* that the government cannot "publish[ ] for the jury an unadmitted exhibit under the guise of impeachment," *id.* at 899, is inapposite in this case, where the videos were authenticated (properly) and admitted as exhibits (improperly) during the trial. (*See* Doc. No. 37-8 at 69–71.)

Petitioner's remaining arguments to the contrary are not persuasive. Although he points to an unpublished 1997 decision of the TCCA involving audio recordings of a drug transaction, where the court distinguished between the admission of a recording and the admission of the *contents* of that recording, *see Henry*, 1997 WL 283735, at *4, Petitioner does not offer any reason to believe that such a distinction is universally or even often applied.[18] And *Henry* itself is distinguishable on its facts from the case at bar. In *Henry*, the TCCA considered tapes to which a police detective referred in his testimony but which "were not understandable" and for that reason were only marked for identification, without being published to the jury. *Id.* When the jury requested to review the tapes during deliberations, the trial court denied the request because the tapes had been "made exhibits for identification purposes only," and in any event, the contents of the tapes had not been presented as evidence. *Id.* at *3. The TCCA upheld this ruling because, regardless of

---

[18] Moreover, it strikes the Court that to the extent that such a distinction could ever be cognizable, such distinction would have to be manifested at the time a recording were admitted into evidence, as for example via the Court providing a limiting instruction to the effect that an exhibit was being admitted as evidence of "the recording" but somehow not as evidence of the *contents* of the recording.

"whether the tapes themselves were entered into evidence or were made exhibits for the purpose of identification only," *id.* at *4, their contents were not played for the jury or properly regarded as evidence helpful to either party:

> Evidence is "any species of proof, or probative matter, legally presented at the trial of an issue, by the act of the parties . . . for the purpose of inducing belief in the minds of the court or jury as to their contention." Black's Law Dictionary 498 (5th ed.1979) (citation to cases omitted). Evidence includes "whatever is submitted to a judge or jury to elucidate an issue, to prove a case, or to establish or disprove a fact in issue." *State v. Harris*, 839 S.W.2d 54, 79 (Tenn.1992), *cert. denied*, 507 U.S. 954, 113 S. Ct. 1368, 122 L.Ed.2d 746 (1992) (Reid, J., dissenting) (citations to other cases omitted). In this instance, the contents of the tapes were not in evidence. Neither the state nor the defense requested that the tapes or any portion thereof be played for the jury. The trial court properly denied the jury's request to review the tapes in the jury room.

*Id.*

Since its (non-precedential) decision in *Henry*,[19] the TCCA has more recently analyzed the admissibility of a compact disc containing the unclear recording of a police interview without drawing any distinction between the medium of the recording and its message. *State v. Langlinais*,

---

[19] The Court regards the decisions of an intermediate state-court with due deference under the following standard: "[W]hen 'an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'" *Church Joint Venture, L.P. v. Blasingame*, 947 F.3d 925, 932 (6th Cir. 2020) (quoting *West v. AT&T*, 311 U.S. 223, 237 (1940)). This rule applies irrespective of whether the intermediate appellate state court decision is published or unpublished. *See Lukas v. McPeak*, 730 F.3d 635, 638 (6th Cir. 2013) ("Where no on-point precedent from the Tennessee Supreme Court is available, this Court must consider any available precedent from the state appellate courts, whether published or unpublished[.]").As the Sixth Circuit has noted more specifically in the federal habeas context, where necessary the court "may consider and follow an unpublished state-court decision on state law, absent a contrary published decision[.]" *Werth v. Bell*, 692 F.3d 486, 497 (6th Cir. 2012) (considering but ultimately declining to follow "unpublished, non-precedential" opinion of Michigan Court of Appeals on petitioner's ability under state law to challenge denial of right to self-representation after guilty plea). Whether the Court "must" (per *Lukas*) or "may" (per *Werth*) at least consider the unpublished opinions of the Tennessee Court of Criminal Appeals, the Court here *does* consider them—considers them, as noted above, "as datum for ascertaining state law[.]" *Church Joint Venture, L.P.*, 947 F.3d at 932 (internal quotation marks omitted)

No. W2016-01686-CCA-R3-CD, 2018 WL 1151951, at *6 (Tenn. Crim. App. Mar. 2, 2018). It has also recognized on more than one occasion that the evidence in a criminal case includes video that was admitted on the State's motion, even if most of the contents of the video were not published to the jury in open court. In *State v. Pollard*, No. W2016-01788-CCA-R3-CD, 2017 WL 4877458 (Tenn. Crim. App. Oct. 30, 2017), an hour-and-a-half long video was entered into evidence without objection at trial, but the State only played eleven minutes of it for the jury. *Id.* at *2. In analyzing the sufficiency of the evidence on direct appeal, the TCCA found that, because "the entire recording was entered as an exhibit," it (meaning the disk or drive containing the video) could be taken to the jury room for examination under Tennessee Rule of Criminal Procedure 30.1 and "considered . . . in its entirety" during deliberations. *Id.* at *5. The TCCA also found that it could consider the entire recording, not just the parts that were played in open court, in examining the sufficiency of the convicting evidence, "[s]ince the jury could have properly considered the recording in its entirety in determining the Defendant's guilt." *Id.* (citing Tenn. R. Crim. P. 30.1 (allowing a jury to take to the jury room for examination during deliberations all exhibits and writings, except depositions) and *State v. Kennedy*, No. E2013-00260-CCA-R3CD, 2014 WL 3764178, at *59–60 (Tenn. Crim. App. July 30, 2014) (finding that trial court did not abuse its discretion by permitting only 36 minutes of three-hour video to be played before jury, because entire recording "was received as an exhibit and not excluded as evidence," so "was readily available for the jury to view during its deliberations had it chosen to view it")).

Moreover, as Petitioner points out (*see* Doc. No. 31 at 7; Doc. No. 32 at 29), the handling of the particular videos in this case elided the requirements of Tennessee Code Annotated Section 24-7-123, entitled "Interview of child by forensic interviewer; sexual contact; video recording." Whatever the substance of Tennessee law governing admission without publication of other kinds

of recordings, Section 24-7-123 defines the conditions for admission of the particular (kind of) recordings at issue in Petitioner's case—and in so doing, it does not draw any distinction between a "video recording" and the particular medium of that recording. The statute governs the admissibility of "a video recording of an interview of a child by a forensic interviewer containing a statement made by the child under thirteen (13) years of age describing any act of sexual [abuse] . . . for its bearing on any matter to which it is relevant in evidence[.]" Tenn. Code Ann. § 24-7-123(a). The statute further "provide[s] that the video recording must be shown to the trial court in a hearing, conducted pre-trial, and [must] possess 'particularized guarantees of trustworthiness,' which is to be determined by the trial court" upon consideration of a host of factors, and upon confirmation that the forensic interviewer met particular educational and professional qualifications at the time of the recording. *State v. Franklin*, 585 S.W.3d 431, 448 (Tenn. Crim. App. 2019) (citing § 24-7-123(b)(2)–(3)). Even though it does not appear that any of these statutory requirements were met in Petitioner's case, consideration of state law as defined in the statute and cases cited above leads this Court to conclude that Ms. Post's recorded interviews with J.A. and T.A., though merely mentioned and not published to the jury prior to deliberations, were admitted evidence (albeit erroneously admitted evidence) in Petitioner's trial.

Having established that the forensic interviews were admitted as evidence, the Court turns to trial counsel's failure to object when the videos were admitted and when the State invited the jury to watch them in the jury room if they chose to do so during closing arguments. The TCCA did not make an explicit deficiency-of-performance ruling,[20] instead proceeding to the following analysis of prejudice under *Strickland*:

---

[20] The TCCA prefaced its analysis of Petitioner's ineffective-assistance claims by noting the following: "The post-conviction [trial] court denied relief, noting that trial counsel admitted that his failure to object to improperly admitted evidence was not meant to further a defensive strategy and that 'several other

As a preliminary matter, we note that the Petitioner has not identified any prejudice he suffered as a result of the admission of J.A.'s forensic interview. As such, we will limit our analysis to the admission of T.A.'s forensic interview, which included the forensic interviewer's summary statement of events that happened in both Davidson and Montgomery Counties. *See Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004) ("Failure to establish either prong [of the *Strickland* test] provides a sufficient basis to deny relief."). . . .

However, despite trial counsel's failure to object to the introduction of the video or request a limiting instruction, the Petitioner has failed to demonstrate that he was prejudiced by its introduction as substantive evidence. As discussed above, the forensic interviewer's summary statement did not violate the Petitioner's right to a unanimous jury verdict because the State provided an election of offenses. The details of each elected offense corresponded to incidents both J.A. and T.A. described in their trial testimony. The Petitioner has failed to prove that there was a reasonable probability that the outcome of the trial would have been different had the forensic interview not been introduced as substantive evidence. Accordingly, the Petitioner is not entitled to relief.

*Guilfoy v. State*, 2015 WL 4880182, at *11–12.

Unusual though it may be for a criminal jury to be allowed to see video evidence for the first time during deliberations,[21] the TCCA's prejudice analysis is (properly) focused not on such unusualness *per se*, but rather on whether counsel's failure to object harmed the defense to the extent that an objection would have had a "substantial, not just conceivable" likelihood of changing the outcome. *Harrington*, 562 U.S at 112. While Petitioner asserts that access to the videos likely affected the outcome in his "close" trial that "hinged on credibility" (Doc. No. 32 at 43–44),[22] in

---

instances of alleged deficient performance' were due to oversights on the part of trial counsel. However, the post-conviction court held that, even if the Petitioner's allegations were true, trial counsel's deficiencies did not result in prejudice." *Guilfoy v. State*, 2015 WL 4880182, at *8.

[21] *But see Nelson v. Kansas*, No. 10–3135–RDR, 2011 WL 2462495, at *13 (D. Kan. June 17, 2011) ("[C]ourts have held that trial courts have the discretion to permit [audiotape] exhibits to go into the jury room for deliberations even if the recordings have not been played in open court.") (citing cases).

[22] Petitioner asserts that the TCCA's "determination of the facts, i.e., that the videotaped interviews played no role in the verdict, is also unreasonable." (Doc. No. 32 at 41.) However, it does not appear that the TCCA made a *factual determination* that the videos played "no role"; rather, the court made a *legal determination* that Petitioner had not carried his burden of demonstrating prejudice.

this context prejudice cannot be presumed but rather must be "affirmatively prove[n]." *Strickland*, 466 U.S. at 692–93.

It was not unreasonable for the TCCA, applying *Strickland*, to conclude that Petitioner did not prove prejudice as a result of counsel's failure to keep the jury from viewing the forensic videos. Importantly, counsel confirmed that he received transcripts of the videos prior to trial, reviewed them, and moved for portions of them to be redacted (*see* Doc. No. 37-23 at 11–15; Doc. No. 37-1 at 38), and that the State was agreeable to his redaction requests. (Doc. No. 37-23 at 42; *see* Doc. No. 37-24 at 3–88 (unredacted and redacted transcripts of T.A.'s interview introduced at post-conviction evidentiary hearing)). He also alerted the jury to the fact that T.A. had made statements outside of the courtroom that "differed in very significant respects" from her trial testimony. (Doc. No. 37-9 at 22–26.) T.A.'s inconsistencies were noted by the TCCA, including that "[i]n the redacted copy of the forensic interview" available to the jury, "T.A. described only one incident of misconduct happening in Davidson County, and it did not include penetration," whereas "[a]t trial, she described three instances that occurred in Davidson County, all three of which included penetration." *Guilfoy v. State*, 2015 WL 4880182, at *11. Of the State's elected offenses involving T.A., all of which charged Petitioner with penetration, the jury returned guilty verdicts on all three but found penetration only as to two of the charges (which were subsequently merged by the TCCA into a single child-rape conviction).[23] Accordingly, it is not at all clear that

---

[23] As recounted by the TCCA in its order denying rehearing of Petitioner's post-conviction appeal:

> T.A. testified about three instances where the Petitioner touched her—once when she left and got into bed with her sister; once when she started crying, went to the bathroom, and wanted to "puke"; and once when she was wearing khakis. . . . The State's election for the three offenses involving T.A. included the following facts: two counts where the Petitioner touched the inside of T.A.'s genitals while in bed and she started crying, wanted to puke, and got into bed with her sister; and one count where the Petitioner touched the inside [of] T.A.'s genitals while in bed and while she was wearing khaki pants.

the forensic interviews bolstered the victims' trial testimony,[24] as Petitioner argues they must have (Doc. No. 32 at 32), or that such testimony would have been insufficient evidence upon which to convict in the absence of the videos.[25] Indeed, insofar as the jury convicted Petitioner of a lesser included offense on one charge of child rape, it partially discredited T.A.'s trial testimony. As to whether there was a reasonable probability that the jury would have discredited other trial testimony related to other offenses of conviction but for counsel's failure to prevent the videos' admission, the instant record permits only conjecture and speculation. Regardless of how this Court would decide that issue in the first instance, the TCCA did not unreasonably apply *Strickland* in resolving it against Petitioner, and AEDPA therefore requires that the TCCA's resolution not be disturbed. *See Woods*, 575 U.S. at 316; *Williams*, 529 U.S. at 411.

### b. Claim 3 – Failure to Object to Improper Opinion Testimony from Anne Post

Finally, Petitioner asserts that trial counsel rendered ineffective assistance when he failed to object to the improper testimony of the forensic examiner, Anne Post, a non-expert who nonetheless testified to her opinion that "'many things,' including trauma, can disrupt a child's

---

(Doc. No. 37-36 at 2.) The TCCA found that "[t]he facts included in the State's election corresponded with the facts presented in the victims' trial testimony," but "did not correspond at all with the forensic interviewer's summary statement in T.A.'s interview." (*Id.* at 3.)

[24] Petitioner objects to the TCCA's limiting its prejudice analysis to the admission of T.A.'s interview, arguing that he "clearly challenged the prejudicial effect of both videos." (Doc. No. 32 at 40.) But the focus of his prejudice argument was clearly T.A.'s interview (*see* Doc. No. 37-30 at 34–36, 48–49) and, in any event, the focus of review under AEDPA is "on the ultimate legal conclusion that the state court reached and not whether the state court considered and discussed every angle of the evidence." *Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir. 2009) (quoting *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir.2002) (en banc)).

[25] The Court notes that the prosecutor in closing argument posited Petitioner's statements and conduct during recorded phone calls as a *significant* factor in assessing the credibility of the girls' testimony, versus the defense's claim that their stories were implausible. (*See* Doc. No. 37-9 at 11–12, 46–48, 52–56.) For his part, trial counsel in his closing described Petitioner's words and behavior during the controlled calls as "[a] subject I suspect I have to address," an "unusual" response by Petitioner in which he "did not do very well for himself at all" by giving answers that "are not what we would want them to be," and a display of "poor judgment." (*Id.* at 33–36, 39.)

memory of 'an abuse event.'" (Doc. No. 31 at 15–16.) Claim 3 was exhausted before the TCCA,

which rejected it based on the following analysis:

> The Petitioner argues that trial counsel should have objected to the following testimony:
>
>> [The State]: What is your experience in the area of interviewing children who have perhaps been subjected to a number of instances of abuse over a fairly lengthy period of time, beginning when they are very young? Is it realistic to expect that you'll get every detail from every incident?
>>
>> [Ms. Post]: Certainly not. It depends, too, on the age of the child. Very little children, we expect to capture only very limited information about any event that happens in their lives. And there are lots of things that can disrupt a kid's memory of an abuse event. Trauma can disrupt memory, for example.
>
> The Petitioner contends that Ms. Post's testimony constitutes improper expert testimony because Ms. Post was not offered as an expert witness. Additionally, the Petitioner argues that the State offered this evidence to support the victims' credibility by explaining why they could not provide any details of when the abuse occurred.
>
> The Tennessee Supreme Court addressed this issue in a similar case, *State v. Bolin*, 922 S.W.2d 870 (Tenn. 1996). In that case, the social worker who performed the forensic interview testified that children who had been abused over a long period of time often had trouble remembering the details of when and how each event took place. *Id.* at 872–73. Our supreme court held that the social worker's testimony constituted expert proof and that its admission through a non-expert witness was error. *Id.* at 874. However, the court also found that any error was harmless. *Id.* Specifically, the court stated:
>
>> The testimony essentially consists of an explanation of a narrow issue— why K.N. could not assign reasonably specific time or dates to any of the alleged events of sexual abuse. Therefore, the testimony does not, unlike the testimony in *Ballard*, purport to completely vouch for the overall credibility of the victim, and thus it cannot be said to have "explained away" the inconsistencies and recantations—the heart of the defense theory. Hence, the damaging effect of the testimony is minimal.[26]

[26] At this point in its analysis, the TCCA inserted the following explanation in a footnote: "In *State v. Ballard*, 855 S.W.2d 557 (Tenn. 1993), the expert witness testified that the victims exhibited 'symptom constellations' consistent with being sexually abused. *Ballard*, 855 S.W.2d at 561. The supreme court concluded that because the behavior profile was consistent with a number of psychological stressors, including sexual abuse, the list of symptoms was too generic to be probative. *Id.* at 562. Therefore, the

*Id.*

Similarly, the admission of Ms. Post's testimony was error. She did not testify as an expert witness but offered testimony that was "specialized knowledge" she gathered from her experience as a forensic interviewer. *See id.* Moreover, we note there is nothing in the post-conviction record to indicate that trial counsel did not object for strategic reasons. Even if this were deficient performance on the part of trial counsel, the Petitioner has failed to establish any resulting prejudice. Like the social worker in *Bolin*, Ms. Post's testimony addressed the narrow issue of why the victims could not provide details of when the events occurred. It did not address inconsistencies in the victims' descriptions of what occurred during the abuse or address the "implausibility" of their allegations, the core of the Petitioner's defense theory during the second trial. Admittedly, there was no conclusive medical evidence that either victim had been sexually abused, but the medical evidence did not rule out the possibility of abuse. Further, the victims told several people about the abuse—their grandfather, their mother, Ms. Post, and Ms. Gallion—over a period of several weeks. Also, they testified about the abuse during the first trial. Trial counsel specifically addressed the inconsistencies between their testimonies at both trials during cross-examination. Accordingly, the Petitioner has failed to demonstrate that he was prejudiced by trial counsel's failure to object to Ms. Post's testimony and is not entitled to relief.

*Guilfoy v. State*, 2015 WL 4880182, at *15–16 & n.6.

As with Claim 1, the TCCA's analysis of Claim 3 identifies attorney error and proceeds under the assumption that the error constitutes deficient performance, but ultimately finds that the lack of resulting prejudice means that counsel's assistance was not constitutionally ineffective. The record supports this analysis. Ms. Post's brief testimony (*see* Doc. No. 37-8 at 63–71) was comprised almost entirely of background information concerning the field of child forensic examination generally—its methodology, underlying principles, connection with law enforcement, etc.—as well as her training and experience in that field, including her experience interviewing children who are very young when they are exposed to trauma. She referred to the specific interviews of J.A. and T.A. only when she was asked to authenticate the disks containing

---

admission of expert testimony was reversible error. *Id.* at 563." *Guilfoy v. State*, 2015 WL 4880182, at *16 n.6.

the videos of those interviews (*id.* at 69–70), and did so without commenting on the plausibility or credibility of either child's statements to her in the interviews. To the extent that her testimony may support the inference that the victims in this case fit the general description of young children with a less-than-accurate grasp of the details of past events, such an inference does not bolster the victims' particular testimony as much as it acknowledges the widely recognized "problem of unreliable, induced, and even imagined" testimony by victims in child rape cases. *Kennedy v. Louisiana*, 554 U.S. 407, 443 (2008). Accordingly, the TCCA reasonably found that counsel's erroneous failure to object to Ms. Post's testimony did not result in the admission of evidence that undercut "the core of the Petitioner's defense theory" or otherwise affected the outcome of the proceeding. *See Brodit v. Cambra*, 350 F.3d 985, 991 (9th Cir. 2003) (rejecting argument that testimony on common reactions of children to sexual abuse "improperly bolsters the credibility of child witnesses and precludes effective challenges to the truthfulness of their testimony," where it does not focus on particular child's candor but "concerns general characteristics of victims"); *Gallardo v. Ndoh*, No. 18-CV-01683-CRB, 2019 WL 802949, at *11–12 (N.D. Cal. Feb. 21, 2019) (finding that such testimony was unlikely "to lead the jury to make impermissible inferences" because it was "sufficiently general" and "not used to opine that a specific child [was] telling the truth").

Because the TCCA reasonably applied *Strickland* to find a lack of prejudice from counsel's failure to object to Ms. Post's testimony, Claim 3 is without merit.

## V. CONCLUSION

The Court does not write on a clear slate in adjudicating the instant Amended Petition. It does not resolve the Amended Petition by deciding, for example, whether Petitioner was in fact guilty (and if so, of what), whether Petitioner should have been convicted by the jury (and if so, of

what), or even whether it personally believes in the first instance that Petitioner's claims are meritorious. Instead, in the manner discussed herein in detail, it applies established principles to determine the extent to which it can review Petitioner's claims at all, and, for those claims that it determines it can review, it applies the demanding standards of AEDPA.

Applying this framework, the Court concludes for the reasons discussed above that Petitioner is not entitled to relief under Section 2254. Accordingly, the Amended Petition will be **DENIED**, and this action will be **DISMISSED** with prejudice.

The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a Section 2254 petitioner. Rule 11, Rules Gov'g § 2254 Cases. A petitioner may not take an appeal unless a district or circuit judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2). A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (citations and internal quotation marks omitted). "[A] COA does not require a showing that the appeal will succeed," but courts should not issue a COA as a matter of course. *Id.* at 337.

Because reasonable jurists could not debate whether Petitioner's claims should have been resolved differently or are deserving of encouragement to proceed further, the Court will **DENY** a COA. Petitioner may seek a COA directly from the Sixth Circuit Court of Appeals. Rule 11(a), Rules Gov'g § 2254 Cases.

An appropriate Order is filed herewith.

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE